UNITED STATES of America, Appellee,

v.

Clemente HERNANDEZ–BERMUDEZ,
Defendant, Appellant.

No. 88–1003.

United States Court of Appeals,
First Circuit.

Heard May 2, 1988.
Decided Sept. 26, 1988.

Charles P. McGinty, Federal Defender Office, Boston, Mass., for defendant, appellant.

Ralph C. Martin, II, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN, Circuit Judge, and FUSTE,* District Judge.

LEVIN H. CAMPBELL, Chief Judge.

Defendant-appellant Clemente Hernandez Bermudez appeals from his jury conviction in the United States District Court for the District of Massachusetts for knowingly and intentionally possessing with intent to distribute cocaine. *See* 21 U.S.C.

* Of the District of Puerto Rico, sitting by designation.

§ 841(a)(1) (1982). The sole ground for appeal is the district court's admission of evidence and its jury instruction regarding defendant's 21–month absence from the jurisdiction in violation of his bail agreement, and subsequent extradition to stand trial. In light of all the evidence against defendant presented at trial, we hold that admission of the flight evidence and the corresponding jury instruction did not prejudice Hernandez's substantial rights. Accordingly, even assuming, without deciding, that admission of the flight evidence would constitute an abuse of discretion in this particular case, we affirm the conviction.

On September 25, 1985, pursuant to a valid search warrant, federal drug agents conducted a search of Hernandez's apartment in Jamaica Plain, Massachusetts, for evidence of drug trafficking. Six or seven agents were present at the search, and one was stationed outside to watch the windows at the rear of the apartment building. At trial, Sergeant Driscoll, who was stationed outside, and Sergeant Murphy and Detective Hartford, two of the agents present inside during the search, testified for the government.

Murphy and Hartford testified that, once they entered the apartment, they found an elderly gentleman, and heard movement coming from behind a closed door in the back of the apartment. After announcing themselves, they broke open the closed door, and discovered defendant in a bedroom. Sergeant Driscoll testified that at approximately the same time, he saw defendant throw two objects from a window at the rear of the building. Driscoll testified that later retrieval of the objects revealed them to be a foil packet of white powder, which was not cocaine, and a sock containing a loaded .25 caliber automatic pistol.

A search of the room revealed several objects indicative of an intent to distribute cocaine, the agents testified. Most importantly, the agents found concealed in the leg of a table a plastic bag containing packets of white powder, revealed by laboratory analysis to be 45 percent pure cocaine. Additionally, testimony revealed, the agents seized from the bedroom a bag of lidocainehydrochloride, some screen-type sifters, and a small mirror. The prosecution entered into evidence a bag of white powder identified as the powder in the foil packet found outside, a plastic bag containing 13 small packets of cocaine, a plastic bag containing lidocainehydrochloride, and the gun and ammunition clip.

Testifying as an expert in drug law enforcement, Detective Hartford explained that such items were consistent with the sale of cocaine. In particular, the amount and purity of the cocaine seized indicated, in Detective Hartford's view, that defendant intended to distribute the substance. Cocaine users rarely have more than one gram of the drug at a time, and the usual strength of cocaine purchased on the street is approximately 21 percent, said the agent. Detective Hartford opined that 45 percent cocaine would be too strong for an individual to inhale without incurring physical injuries. Additionally, the agent testified, both lidocainehydrochloride and non-specific white powder, such as that found in the foil packet, are used in "cutting" or diluting cocaine. The sifting screen and mirror also would be used in the process of diluting the cocaine for sale on the street, Detective Hartford stated.

Although the prosecution entered into evidence 13 small packets of cocaine, there was a dispute at trial over how much cocaine the agents seized. Both Sergeant Murphy and Detective Hartford testified that one plastic bag containing cocaine was seized from defendant's apartment. In completing the return on the search warrant, Detective Hartford indicated that the search revealed 13 packets of the drug. In his report to the Drug Enforcement Administration, however, Detective Hartford wrote that there had been found only 12 packets of cocaine. When asked to explain the discrepancy, Detective Hartford testified that, inside the plastic bag, the cocaine was in two other plastic bags, one containing ten packets and one containing three. Because he did not want to disturb the contents, he explained, he counted the packets through the plastic and miscounted

the ten packets as nine. Later, the detective testified, the bag was opened and the two bags containing ten and three packets were discovered.

Defendant disputed much of the evidence presented by the government. Testifying in his own defense, Hernandez admitted that the search revealed cocaine in his bedroom, but testified that there were only three small packets of cocaine, rather than the 13 introduced by the government. Hernandez testified that he is a cocaine addict, and uses between one half a gram and a gram of cocaine daily, having a street value of from $20 to $60. It was unusual for him to have three grams of cocaine at one time, defendant testified, but on this occasion he had purchased extra for a party he was planning. Hernandez denied that the agents' search produced the sifters, lidocainehydrochloride, or mirror. Additionally, he denied that the gun and foil packet were his, and testified that he did not have time to throw them from the window. On cross-examination, Hernandez acknowledged that he was unemployed for the four months preceding his arrest, but stated that he supported his habit by taking odd jobs as a barber, carpenter and mechanic. Hernandez also testified that he was unaware of the cocaine's high purity, but that he had tested it by placing some on his tongue when he purchased it and that it had the same effect on him as cocaine he had purchased in the past. Finally, over Sergeant Driscoll's denial, Hernandez testified that Sergeant Driscoll had approached him on three occasions previous to the search. Defendant testified that on one of those occasions Driscoll had threatened to "get" him, and on another, had conducted a strip search of Hernandez in a public restroom.

In addition to testimony about the search, the government introduced evidence that defendant had absented himself from the jurisdiction for 21 months after being arrested and charged. Upon his initial arrest, Hernandez was released on bail providing that, among other things, he would remain in Massachusetts and report to the court's Pre–Trial Services office thrice weekly. No trial date was set. Soon after his release, Hernandez twice failed to report to Pre–Trial Services, and on October 3, 1985, the court issued a warrant for his arrest. He appeared on October 8, 1985, and subsequently was released subject to similar conditions, except that he was to report to Pre–Trial Services daily. Again, he failed to do so, and the court issued a second arrest warrant on October 22, 1985. Defendant subsequently was found in New Jersey, and was brought before the court 21 months later, on August 10, 1987.

On the stand, Hernandez explained that after the change in his bail conditions, he had gone to New York to be with his wife and child, who were sick. His wife, he testified, was admitted to a New York hospital for six days in November 1985. He admitted that he did not attempt to contact Pre–Trial Services, but stated that he was unconcerned because he was expecting a letter to be forwarded to him from his Massachusetts address telling him when to report for trial. Hernandez testified that he was unaware of the warrant for his arrest.

Upon completion of the parties' cases, the court instructed the jury as follows:

[T]he intentional flight by a defendant after he is accused of a crime is not sufficient by itself to say a man is guilty. However, you may consider the flight of the defendant, in the light of all other evidence in this case, in determining his guilt or innocence.

Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to any such evidence are matters exclusively within your province.

 We find it an exceedingly close question whether the district court erred in admitting the flight evidence. Evidence of an accused's flight may be admitted at trial as indicative of a guilty mind, so long as there is an adequate factual predicate creating an inference of guilt of the crime charged. *United States v. Grandmont,* 680 F.2d 867, 869 (1st Cir.1982); 2 Wigmore, *Evidence* § 276, at 122 & n. 2 (Chadbourne rev. 1979). Courts, however,

should exclude even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403. Presumably the prosecutor here offered the evidence of Hernandez's flight to show his consciousness of guilt in regard to the charged cocaine offense. But we see little necessity for that purpose in the flight evidence here. There was already overwhelming evidence that Hernandez was conscious he was guilty of *some* kind of drug offense. Defendant's own testimony that there were three packets of cocaine found in his apartment left unquestioned that he was aware of some degree of culpability. Admittedly, there is a difference between a consciousness of guilt about possessing cocaine and guilt about intending to distribute the drug. Defendant's testimony acknowledged the former, but not the latter. But we doubt that Hernandez's flight could any more show consciousness of guilt over the *distribution* of cocaine than over its conceded possession. In these circumstances, we think it would have been better for the prosecutor not to have offered, and the court not to have admitted, the flight evidence at all. Still, some of the same circumstances that reduced the value of the flight evidence also tended to reduce its prejudicial effect on the jury. In particular, Hernandez's admitted association with drugs tarnished his image to a degree where the flight evidence seems unlikely to have much worsened it.

Balancing probativeness against prejudice falls within the district court's discretion. Only an abuse of that discretion constitutes error. *United States v. Scelzo,* 810 F.2d 2, 4 (1st Cir.1987) (citing *United States v. Kadouh,* 768 F.2d 20, 21 (1st Cir.1985)). Assuming, without deciding, the existence of such an abuse here, the question would still remain whether admission of the flight evidence coupled with the court's reference thereto in its instruction were prejudicial to Hernandez's substantial rights. *See* Fed.R.Crim.P. 52(a) (errors not affecting substantial rights shall be disregarded). In order to evaluate the harmlessness of the district court's actions, we ask whether we can say "with fair assur-ance, after pondering all that happened without stripping the [evidence of flight] from the whole, that the [jury's] judgment was not substantially swayed by the [evidence]." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *accord United States v. Mazza,* 792 F.2d 1210, 1216–17 (1st Cir.1986), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987); *United States v. Pisari,* 636 F.2d 855, 859 (1st Cir.1981). This court has ruled that the *Kotteakos* "fair assurance" standard is satisfied if it is "highly probable" that the challenged action did not affect the judgment. *Mazza,* 792 F.2d at 1221 (citing *Government of Virgin Islands v. Toto,* 529 F.2d 278, 284 (3d Cir.1976) (quoting R. Traynor, *The Riddle of Harmless Error* 35 (1970)).

■ The strongest argument that the flight evidence was prejudicial stems from the possibility that the jury used it in assessing defendant's credibility, especially in regard to his claim that he was a user but not a vendor of drugs. An individual who would leave the jurisdiction after being charged with a crime might be more likely to commit perjury. The two acts share in common a lack of respect for the courts. The jury's perception of Hernandez's credibility was central to his defense; he essentially charged that the prosecution's case was a fabrication, asking the jury to believe his version of the events rather than the version told by the federal drug agents and physical evidence. There was much other evidence at trial, however, which militated against Hernandez's credibility. First, it might seem unlikely that so many agents would fabricate a case against defendant by planting evidence against him, falsifying the warrant return and administrative report, and testifying falsely and elaborately at trial. Second, defendant's story itself contained implausibilities. Defendant admitted to cocaine addiction, yet on cross-examination claimed that he supported himself and his habit, at a cost of $20 to $60 daily, by taking odd jobs. Additionally, defendant was unable to account for the cocaine's high purity, claiming only that he tested the drug and found nothing unusual about it. Although the prosecu-

tion's case contained an inconsistency concerning the amount of cocaine seized, it was explained plausibly by Detective Hartford. And finally, since the flight evidence merely corroborated Hernandez's consciousness of guilt, and the likelihood is slight that the evidence lowered the jury's estimation of his character, it is highly probable that there was no prejudice to defendant's case on those grounds. Thus, in light of all the evidence presented, the inference of untruthfulness raised by the flight evidence would not have swayed substantially the jury's assessment of defendant's credibility. Accordingly, we are satisfied that admission of the flight evidence was not prejudicial to the defense.

■ Similarly, it is improbable that the jury instruction regarding flight affected the jury's judgment in Hernandez's case. In addition to objecting generally to a jury instruction regarding flight, Hernandez objects to the instruction's characterization of his absence from the state as "flight," arguing that it was within the jury's province to decide whether he fled the jurisdiction to avoid prosecution or simply took up a new residence for unrelated reasons.[1] As defendant had the opportunity to explain to the jury his disappearance from Massachusetts, however, it is highly probable that the use of the word "flight" (as opposed to "relocation") had little or no effect on the jury's judgment.

■ Having decided that the lower court's actions were harmless, we do not reach the question of whether the district court committed an abuse of discretion in admitting the flight evidence under the circumstances presented by this case. We urge, however, that courts exercise caution in admitting this type of evidence. Although it is undisputed that flight of an accused can properly be admitted as having a tendency to prove guilt, *Allen v. United States,* 164 U.S. 492, 499, 17 S.Ct. 154, 156, 41 L.Ed. 528 (1896), it also is acknowledged widely that, at least in many cases, such evidence is "only marginally probative as

to the ultimate issue of guilt or innocence." *United States v. Robinson,* 475 F.2d 376, 384 (D.C.Cir.1973). *See also Wong Sun v. United States,* 371 U.S. 471, 483–84 n. 10, 83 S.Ct. 407, 415 n. 10, 9 L.Ed.2d 441 (1963). The conventional wisdom that "the wicked flee, even when no man pursueth, but the righteous are as bold as a lion," *see* 2 Wigmore, *Evidence* § 276 (Chadbourne rev. 1979), has been questioned by some courts, one of which asserted that "men who are entirely innocent do sometimes fly from the scene of a crime" for a multitude of reasons, including, for example, hesitation to confront even false accusations, fear that they will be unable to prove their innocence, or protection of a guilty party. *Miller v. United States,* 320 F.2d 767, 770–71 (D.C.Cir.1963) (quoting *Alberty v. United States,* 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051 (1896)). Hernandez could have been indifferent to or unaware of the significance of violating his bail conditions, which, while not admirable, is not tantamount to a confession of guilt. Because of the very undesirability of his conduct, in a closer case the danger of jury prejudice could be quite real. This is not to say that evidence of flight may not, in some circumstances, be strongly probative. The rationale for admitting evidence of flight is long standing, and we do not suggest that, where genuinely relevant, it should be withheld. Yet it is a species of evidence that should be viewed with caution; it should not be admitted mechanically, but rather district courts should always determine whether it serves a genuinely probative purpose that outweighs any tendency towards unfair prejudice. *United States v. Lynn,* 856 F.2d 430, 433–37, (1st Cir.1988). Prosecutors can assist in this regard, and indeed will help protect the record, if they evaluate such evidence carefully and offer it only where meaningful.

AFFIRMED.

---

1. The government originally objected to this line of argument, claiming that defendant's counsel objected only generally to the instruction and thus failed to preserve for appeal the issue of the instruction's specific language. Appellee's counsel retreated from this argument during oral argument, however, conceding that defense counsel's vehement objection was sufficient to preserve an appeal of both the existence and form of the instruction.